Style Definition: Quote

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DUAL NORTH AMERICA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>DENNIS KEARNS, DANIEL SIMNOWITZ, PATRICK DARRAGH, and AVESI PARTNERS, LLC,<br><br>Defendants. | Case No. 23-cv-8918 (JMF)(SDA)<br><br>**SECOND AMENDED COMPLAINT** |

## TABLE OF CONTENTS


TABLE OF CONTENTS ....ii

INTRODUCTION .... 11

PARTIES .... 33

JURISDICTION AND VENUE .... 44

FACTUAL BACKGROUND .... 55

I. THE INDIVIDUAL DEFENDANTS WERE THE SENIOR LEADERS OF DUAL'S TRANSACTIONAL RISK DIVISION .... 55

A. The Transactional Risk Division Is a Highly Profitable Business that Insures Corporate Mergers & Acquisition Deals .... 55

B. The Transactional Risk Division Is Dependent upon Four Insurance Carrier Partners for Authority to Underwrite Policies .... 66

C. The Majority of Transactional Risk's Business Is Representations and Warranties Insurance, Where the Individual Defendants Specialize .... 88

II. DUAL ENTERED INTO EMPLOYMENT AGREEMENTS WITH THE INDIVIDUAL DEFENDANTS THAT, AMONG OTHER THINGS, WERE DESIGNED TO PROTECT DUAL IF THE INDIVIDUAL DEFENDANTS EVER TERMINATED THEIR EMPLOYMENT .... 9

Field Code Changed

A. DUAL's Standard EA Is Designed To Protect DUAL when Its Employees Leave .... 99

B. DUAL Negotiated EAs with Kearns and Simnowitz that Resulted in Modifications to Pertinent Provisions of DUAL's Standard EA .... 14

Field Code Changed

C. Darragh Signed a Standard EA .... 1717

D. The Individual Defendants Also Enrolled in an Employee Stock Purchase Program and Received Shares Worth Substantial Amounts when Vested .... 18

Field Code Changed

III. KEARNS, DARRAGH, AND SIMNOWITZ SECRETLY REACHED AGREEMENT WITH DEFENDANT AVESI PARTNERS TO HELP THEM LAUNCH A NEW TRANSACTIONAL-RISK GA THAT WILL COMPETE WITH DUAL .... 19

Field Code Changed

IV. ON SEPTEMBER 8, 2023 – WITHOUT PROVIDING ADVANCE NOTICE TO DUAL – KEARNS, DARRAGH, AND SIMNOWITZ TOLD THE MARKET

THAT THEY WERE LEAVING DUAL AND THAT DUAL'S TRANSACTION SOLUTIONS GROUP WAS EFFECTIVELY OUT OF BUSINESS ............................21

Field Code Changed

V. DUAL IMMEDIATELYAS THE INDIVIDUAL DEFENDANTS CONTINUED TO ACT DISLOYALLY, DUAL SUFFERED SUBSTANTIAL INJURIES THAT CONTINUE TO ACCRUE............................................................................2323

A. DUAL Lost Deal Flow and Substantial Business as A. ............Defendants Induced Potential Customers To Believe DUAL Could No Longer Underwrite Policies, and DUAL Lost Deal Flow and Substantial Business ..........................23

Field Code Changed

B. Defendants Injured DUAL's Relationships with Its Insurer Partners .................26

C. B..The Individual Defendants Directly or Indirectly Caused Six More Members of DUAL's Transaction Risk Division Resigned ToTo Resign from DUAL and Join the New Venture...............................................................................2824

C. Defendants Injured DUAL's Relationships with Its Insurer Partners by Poaching DUAL's Key Employees and by Dissuading the Insurer Partners from Dealing with DUAL and/or by Soliciting Them to Support Defendants' New Venture ....................................................................................26

VI. THE RESTRICTIVE COVENANTS IN DUAL'S EMPLOYMENT AGREEMENTS ARE NECESSARY TO PROTECT DUAL'S LEGITIMATE INTERESTS..........................................................................................................29

Field Code Changed

VII. ON OCTOBER 11, 2023, THE INDIVIDUAL DEFENDANTS PURPORTED TO TERMINATE THEIR EMPLOYMENTS WITH DUAL .......................................30

Field Code Changed

COUNT I - BREACH OF CONTRACT AGAINST EACH INDIVIDUAL DEFENDANT...........................................................................................................3131

COUNT II - BREACH OF EMPLOYEE FIDUCIARY DUTIES OF LOYALTY AGAINST EACH INDIVIDUAL DEFENDANT..........................................................32

Field Code Changed

COUNT III – AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY ....................34

Field Code Changed

COUNT IV – TORTIOUS INTERFERENCE WITH CONTRACT...........................................35

Field Code Changed

COUNT V - TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS ...........................................................................................................37

Field Code Changed

COUNT VI – FAITHLESS SERVANT DOCTRINE AGAINST EACH INDIVIDUAL DEFENDANT...........................................................................................................38

Field Code Changed

COUNT VII - UNJUST ENRICHMENT AGAINST EACH INDIVIDUAL DEFENDANT...........................................................................................................39

Field Code Changed

REQUEST FOR JURY TRIAL ........................................................................................40

PRAYER FOR RELIEF.........................................................................................................4040

Field Code Changed

**INTRODUCTION**

1. This is an employment dispute between Plaintiff DUAL North America, Inc. ("DUAL") and several of its former highly placed executives, who, while they were still employed by DUAL, sabotaged the company's business in the course of announcing their plans to launch a new competing venture. These executives also, while subject to insurer- and employee-nonsolicitation restrictions and while still employed by DUAL, directly or indirectly solicited DUAL's insurers and employees to join their new business.

2. DUAL is an insurance underwriter and is often referred to as a General Agent ("GA"). A GA is a licensed insurance general agent appointed by an insurer to negotiate and bind the insurer to contracts of insurance. One of DUAL's divisions, known as Transaction Solutions, is a GA with authority to underwrite risks and to bind partner insurance carriers to insurance policies that mitigate the risks of corporate transactions, like mergers & acquisitions. Defendants Dennis Kearns, Daniel Simnowitz, and Patrick Darragh (collectively, the "Individual Defendants") were the leaders of DUAL's Transaction Solutions group. Defendant Avesi Partners, LLC ("Avesi Partners") is a private equity firm that induced the Individual Defendants to quit their DUAL employments, to engage in the misconduct alleged herein, and to launch a new GA in competition with DUAL.

3. Each Individual Defendant has an employment agreement with DUAL. Pursuant to these employment agreements and the common law, each Individual Defendant owed a duty of loyalty to act in the best interests of DUAL and not to interfere with DUAL's relationships with its insurance-carrier partners, referral sources, and other employees while employed by DUAL. Each Individual Defendant also owes post-employment contractual duties not to solicit DUAL's insurance-carrier partners and employees for limited periods of time.

4. On September 8, 2023, the Individual Defendants breached these ~~promises~~duties by notifying the transactional-risk marketplace they had resigned from DUAL, without regard to their mandatory-notice provisions, without notifying DUAL first, and without offering DUAL an opportunity to protect its key relationships. The damage was swift and massive. DUAL's referral sources, customers, and prospective customers immediately began canceling DUAL's pending deals and sending their work elsewhere. DUAL's insurance-carrier partners immediately began suspending DUAL's authority to bind them to transactional-risk policies.

5. Defendants went further and, while still DUAL employees, affirmatively undermined DUAL in the market by directly or indirectly publishing the rumor that DUAL was effectively "out of business" due to the loss of the Individual Defendants. Defendants also communicated directly with DUAL's carrier partners to promote their own GA venture while undermining DUAL's status with them.

6. As a result of these actions, DUAL effectively lost nearly all of the business that it could have expected to generate during the remaining periods of the Individual Defendants' employment and post-employment restrictive covenants – approximately $15 million. Plus, DUAL effectively lost the capability to pursue most new business opportunities.

7. At the same time, while the Individual Defendants were still employed by DUAL and subject to contractual and common law duties of loyalty to their employer, they cooperated with Avesi Partners in the recruitment of other members of DUAL's Transaction Solutions group to quit DUAL and join in the launching of the new GA – an offer that six other DUAL employees have accepted to date.

8. In sum, Defendants effectively torpedoed DUAL's business while simultaneously salvaging from its wreckage the components necessary to build a new GA in the same

competitive space. And they did it all while the Individual Defendants were still accepting paychecks and benefits from DUAL.

9. DUAL brings this action for injunctive relief and damages.

**PARTIES**

10. Plaintiff DUAL North America, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business located at 1100 5th Avenue South, Suite 301, Naples, Florida 34102. DUAL is a citizen of the States of Delaware and Florida.

11. Defendant Dennis Kearns is an individual who, upon information and belief, resides and is domiciled in Verona, New Jersey. Kearns' place of employment as a DUAL employee was New York, New York. Based on the information available to DUAL, Kearns is a citizen of New Jersey.

12. Defendant Daniel Simnowitz is an individual who, upon information and belief, resides and is domiciled in Scarsdale, New York. Simnowitz's place of employment as a DUAL employee was New York, New York. Based on the information available to DUAL, Simnowitz is a citizen of New York.

13. Defendant Patrick Darragh is an individual who, upon information and belief, resides and is domiciled in West Islip, New York. Darragh's place of employment as a DUAL employee was New York, New York. Based on the information available to DUAL, Darragh is a citizen of New York.

14. Defendant Avesi Partners, LLC is a limited liability company whose website lists offices in Stamford, Connecticut and Richmond, Virginia. Upon information and belief, the members of Avesi Partners are individuals who reside in Connecticut and Virginia, and, therefore, Avesi Partners is a citizen of the States of Connecticut and Virginia.

**JURISDICTION AND VENUE**

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $ 75,000.00 and there is complete diversity of citizenship between the parties. Specifically, Plaintiff is a citizen of Delaware and Florida, and no Defendant is a citizen of the States of Delaware or Florida. Upon information and belief, the Individual Defendants are New York or New Jersey citizens, and, upon further information and belief, Avesi Partners is a citizen of Connecticut and Virginia.

16. The Court has personal jurisdiction over the Individual Defendants because they consented to personal jurisdiction in this district in the employment agreements they signed with DUAL and waived any objections thereto. Moreover, the Individual Defendants were employed in, reside in, and/or regularly transact business in New York State and in this district, and most of the conduct giving rise to this Complaint was performed in, or originated from, New York. Avesi Partners' tortious interference with DUAL's contracts was knowingly directed at several employees regularly performing work in New York, New York. Upon information and belief, Avesi Partners also intends to avail itself of the benefits of New York law by forming its new GA in New York.

17. Venue is proper in this district because in the employment agreements between DUAL and Individual Defendants, all parties agreed and consented to the exclusive jurisdiction of New York courts. Venue is also proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to the claims occurred within this judicial district. Defendants are further subject to personal jurisdiction in this forum by virtue of the ongoing business they transact in this district.

## FACTUAL BACKGROUND

### I. THE INDIVIDUAL DEFENDANTS WERE THE SENIOR LEADERS OF DUAL'S TRANSACTIONAL RISK DIVISION

18. DUAL is an insurance underwriting organization whose most significant assets are top talent and strong relationships with its industry partners. DUAL is part of the DUAL Group, which is the underwriting arm of Howden Group Holdings, an international insurance intermediary founded in 1994. DUAL is organized broadly into three divisions: Property, Casualty, and Personal Lines. Within each of these three divisions, one or more business units performs GA services across various insurance lines of business.

#### A. The Transactional Risk Division Is a Highly Profitable Business that Insures Corporate Mergers & Acquisition Deals

19. This case relates to DUAL's Transaction Solutions business unit, also known as Transactional Risk ("TR"), which operates within the Casualty division. TR is the largest business unit within the Casualty division in terms of gross written premiums and profitability. In the fiscal year ending September 30, 2022, TR accounted for approximately $287.4 million of premiums (and $35.8 million in revenue), or approximately 30% of the Casualty division's approximately $1 billion in annual gross written premiums and more than 20% of the Casualty division's profits. Since the beginning of fiscal year 2021, TR has produced more than $600 million in gross written premiums.

20. TR's business is to underwrite, bind, and issue insurance policies for insurable risks arising from corporate transactions, typically M&A deals. TR is not itself the insurer of the risks. Rather, it operates as the GA on behalf of insurance-carrier partners who authorize TR to underwrite and bind transactional risk policies up to a certain limit of coverage based upon pre-approved underwriting and pricing guidelines.

### B. The Transactional Risk Division Is Dependent upon Four Insurance Carrier Partners for Authority to Underwrite Policies

21. DUAL created TR in 2020 after hiring Dennis Kearns from another insurance company, QBE, where he had developed a transactional risk business that was insured solely by QBE. The process of hiring Kearns was protracted. DUAL had to convince Kearns that a GA in the transactional risk space would work, that DUAL could accomplish it with Kearns' help, and that DUAL could compensate Kearns well enough. A major part of DUAL's early discussions with Kearns related to the incentive stock compensation that he would receive upon joining DUAL. Throughout these discussions, both parties understood and agreed that, after they had reached agreement in principle on Kearns' compensation, they would negotiate a written employment agreement with additional terms, including, in particular a notice-of-resignation (aka "garden leave") provision and restrictive covenants. Such employment agreements are commonplace among executives in the insurance industry in general, and among GAs and transactional risk businesses in particular.

22. While these negotiations were occurring, DUAL and Kearns worked together to obtain capacity to bind insurance carriers to transactional risk policies. This capacity is also known in the industry as "paper," in reference to the insurance policy forms and authority to issue those policies that GAs must obtain from their carrier partners. To obtain capacity from an insurance carrier, a GA must enter into a Program Administration Agreement ("PAA"), which is sometimes also referred to as an Underwriting Management Agreement or a Binding Authority Agreement.

23. DUAL hired Aon, an insurance broker, to help it identify insurers who might be willing to provide transactional risk capacity. DUAL and Kearns prepared a business plan, underwriting guidelines, and pricing that DUAL and Kearns cooperatively shopped to over 100

insurance carriers that Aon helped to identify. The business plan already identified as key DUAL personnel two of Kearns' current or former colleagues whom DUAL had not yet hired: Pat Darragh, who was then employed by QBE and worked with Kearns, and Daniel Simnowitz, who was then at W.R. Berkley but who had previously worked with Kearns and Darragh at QBE for approximately two years.

~~24.~~ TR first obtained capacity from Continental Casualty Company ("CNA"). ~~DUAL ultimately paid Aon approximately $1 million for its help to obtain this capacity.~~

~~25.~~24. DUAL subsequently entered into contractual relationships with three more insurance-carrier partners in addition to CNA: Old Republic Union Insurance Company ("Old Republic"), Palms Insurance Company ("Palms"), and Vantage Risk Specialty Insurance Company ("Vantage"). The four carrier partners collectively authorized TR to underwrite coverage up to a total insurance limit of $50 million per policy.

25. DUAL ultimately paid Aon $500,000 or more for its help to obtain this capacity. DUAL did not obtain this capacity based on the Individual Defendants' preexisting relationships with CNA, Old Republic, Palms, or Vantage. The Individual Defendants did not previously act as agents for those insurers on transactional risk policies or otherwise have relationships with those insurers that that were sufficient to secure their authorization to write transactional risk policies.

26. The PAAs for DUAL's four carrier partners differed as to which employees at TR, precisely, were authorized to bind the carrier partners. Two of the carriers, Old Republic and Palms, had "key man" provisions that specified only Kearns had authority to bind them. Darragh was originally proposed as a co-key man on one of these policies, but Kearns procured his removal from that provision. The other carriers, CNA and Vantage, distributed different

levels of authority among Kearns, Darragh, Simnowitz, and others at DUAL. As to all four of these carriers, however, Kearns, Darragh, and Simnowitz had the most authority, were critical to the relationships, and thus occupied extraordinary positions within DUAL's TR division.

27. The carrier partners operate interdependently as to each other. Each agreed to authorize a certain percentage of risks that TR underwrote. CNA, as the lead carrier partner, is TR's most important insurer because the other carriers generally follow whatever CNA decides to do.

28. Once DUAL obtained capacity to bind insurers, DUAL began marketing its services to referral sources, such as licensed brokers, M&A law firms that use brokers, and other private equity ("PE") firms and corporations that are serial participants in M&A transactions. These referral sources refer parties who are involved in corporate transactions to providers of transactional risk insurance, like DUAL. These parties thus become DUAL's "customers" or "prospective customers."

29. DUAL made substantial financial investments in the Individual Defendants' efforts to market DUAL's TR division to referral sources, customers, and prospective customers.

**C. The Majority of Transactional Risk's Business Is Representations and Warranties Insurance, Where the Individual Defendants Specialize**

~~29.~~30. TR insures three lines of risks: (1) representations and warranties, also known as "reps & warranties," (2) tax liabilities, and (3) contingent liabilities. Of TR's approximately $287 million in premiums in the fiscal year ending September 30, 2022, reps & warranties insurance accounted for approximately $150 million, while tax liabilities and contingent liabilities accounted for approximately $50 million each. Kearns, Darragh, and Simnowitz each focus on reps & warranties insurance. Kearns is unique, however, because he is the group's overall "rainmaker" who brings in business across all three lines.

~~30.~~31. One pertinent aspect of transactional-risk insurance is that, unlike other types of insurance that feature renewals of policies, all transactional-risk policies are issued one time – when a corporate transaction closes – and never renewed. Therefore, the only type of business is new business.

## II. DUAL ENTERED INTO EMPLOYMENT AGREEMENTS WITH THE INDIVIDUAL DEFENDANTS THAT, AMONG OTHER THINGS, WERE DESIGNED TO PROTECT DUAL IF THE INDIVIDUAL DEFENDANTS EVER TERMINATED THEIR EMPLOYMENT

~~31.~~32. On or around January 29, 2020, former DUAL CEO, Jon Beckham, extended offer letters to Kearns, Simnowitz, and Darragh. These offer letters stated, in pertinent part:

> You agree to observe all rules and policies that the Company may now have or hereafter establish from time-to-time governing the conduct of its employees including without limitation your agreement to keep Company information strictly confidential, both while you are employed by the Company, and at all times thereafter, and to the return of Company property at the end of your employment, as well as policies restricting or prohibiting engaging in outside employment, competitive activities, solicitation, and detrimental conduct, to include the period during and after your employment with the Company.

~~32.~~33. The offer letters also stated:

> The terms of employment set forth herein are the basic terms but are not exclusive, and supersede any prior promises or representations, written or oral. If you are in agreement with this summary of the basic terms of employment then please sign and return this letter, and we will follow up with a formal contract over the next few weeks which contract will address the above terms as well as other terms and conditions of employment.

~~33.~~34. DUAL thereafter tendered to Kearns, Simnowitz and Darragh, at different times, copies of DUAL's standard employment agreement ("EA").

### A. DUAL's Standard EA Is Designed To Protect DUAL when Its Employees Leave

~~34.~~35. DUAL's standard EA contains provisions that establish a contractual duty of loyalty and honesty to DUAL. It provides that the employee shall:

> (b) loyally and diligently perform the duties and exercise such powers for the Company (and any Group Company) as reasonably assigned to him or her from time to time by or under the authority of the Company, the Supervising Executive or Senior Management of the Company in such manner as shall be specified by or under the authority of the Company, the Supervising Executive or Senior Management of the Company;
>
> (c) well and faithfully serve the Company and any Group Company and use his or her best endeavors to promote and protect the interests of the Company and any Group Company always giving it the full benefit of his or her knowledge, expertise and skill and will not knowingly or deliberately do anything which is to its detriment including having any direct or indirect involvement in:
>
> (i) any situation whereby work or business opportunities are or may be diverted away from the Company or any Group Company; or
>
> (ii) discussions with any other employees of the Company or any Group Company about his or her leaving the employment of the Company, either alone or as part of a group or team of more than one person to join a new employer who is or may become a competitor of the Company.
>
> * * *

*See* § 4.1(b)-(c).

~~35.~~36. DUAL's standard EA also provides that the employee cannot be engaged or employed in a competing business during his DUAL employment:

> During Employment, the Employee shall not (save with the prior written consent of the Company):
>
> (a) directly or indirectly be employed, engaged or have an equity interest in any capacity in any unaffiliated business, trade or occupation in competition with products or services of the Company . . . ; or
>
> (b) introduce to any other person, firm or company other than the Company or any Group Company, or transact for the account of herself or any other unaffiliated person, firm or company other than any Group Company, business of any kind with which the Company is in the business of performing or providing.
>
> * * *

*See* § 12. Hereafter, all of the foregoing provisions shall collectively be referred to as the "Loyalty

Provisions."

~~36.~~37. DUAL's standard EA also contains other provisions that are designed to protect DUAL when its employees leave DUAL.

~~37.~~38. DUAL's standard EA contains the following notice-of-resignation provision~~:~~ ("Notice Provision"):

> Termination by Employee. The Employee may terminate his or her employment at any time during the course of their employment with Company by providing thirty (30) days' notice in writing to their Supervising Executive. During the notice period, the Employee must fulfill all of his or her duties and responsibilities pursuant to Section 4.1 of this Agreement. Failure to comply with this requirement may result in Termination for Cause as described in Section 11.2(c) below, but otherwise, Employee's salary and benefits will remain unchanged during the notification period.

*See* § 11.2(a). The Notice Provision is reciprocal and requires DUAL to provide 30 days written notice before terminating an employee without cause.

Formatted: DW List Number

~~38.~~39. The ~~notice-of-resignation provision~~Notice Provision is also known within the industry as the "garden leave" provision because employers will typically sideline departing employees, while continuing to pay them, to ensure the employees are still subject to their duty of loyalty to the employer while the employer tries to secure its key relationships with customers, industry partners, and employees that were dependent, in whole or in part, upon the departing employee.

~~39.~~40. DUAL's standard EA contains the following non-competition provision ("Non-Compete"):

> The Employee shall not during the Employment with the Company and for a period of twelve (12) months after the Termination Date, regardless of the reason for the Employee's termination, directly or indirectly, compete with the Company by serving as an officer, owner, partner, director, agent, employee or consultant to any firm or entity substantially engaged in a business similar or competitive to the business of the Company.

*See* Schedule 1, § 3.2(a).

~~40.~~41. DUAL's standard EA also contains the following restrictions on its employees soliciting insurance-carrier partners and other DUAL employees:

> The Employee shall not during the Employment or for a period of twelve (12) months after the Termination Date either on his or her own account or on behalf of or in association with any other person or entity, in competition with the Company directly or indirectly canvass, induce, solicit, approach, or seek out or cause to be canvassed, induced, solicited, approached or sought out any [Customer or Prospective Customer or Restricted Insurer or Restricted Producer] for orders or instructions in respect of any services provided or supplied by the Company.[1] (the "Non-Solicit Provision")
>
> ***
>
> The Employee shall not during the Employment and for a period of twelve (12) months after the Termination Date either on his or her own account or on behalf of or in association with any other person or entity, in competition with the Company, directly or indirectly deal with any [Customer or Prospective Customer or Restricted Insurer or Restricted Producer].[2] (the "No-Dealing Provision")
>
> ***
>
> The Employee shall not during the Employment or for a period of twelve (12) months after the Termination Date either on his or her own account or on behalf of or in association with any other person or entity in competition with the Company directly or indirectly solicit, induce, hire or endeavor to entice away from providing services to the Company or cause to be solicited, induced, hired or enticed away from providing services to the Company, any person who on the Termination Date was a Restricted Person.[3] (the "No-Recruitment Provision")
>
> ***

[1] *See* Schedule 1, § -3.3.

[2] *See* Schedule 1, § 3.4.

[3] *See* Schedule 1, § 3.5(a).

~~41.~~42. The purpose of the foregoing Loyalty, Notice, Non-Compete, Non-Solicit, No-Dealing, and No-Recruitment Provisions are collectively designed to ensure that when an employee who is integral to any of DUAL's key relationships intends to leave DUAL, DUAL is provided substantial opportunity over a total period of 15 months to protect those relationships from being undermined by the departing employee.

43. DUAL's standard EA also contains the following restrictions on its employees' use and disclosure of DUAL Confidential Information ("Confidentiality Provision"):

> The Employee will not during the Employment (otherwise than in the proper performance of his or her duties and then only to those who need to know such Confidential Information) or thereafter (except with the prior written consent of the Board or the Company or as required by law, governmental authority or legal process):
>
> (a) divulge or communicate to any person (including any representative of the press or broadcasting or other media);
>
> (b) intentionally and knowingly cause or facilitate any unauthorized disclosure through any failure by him to exercise all due care and diligence of; or
>
> (c) make use (other than for the benefit of the Company or any Group Company) of
>
> any Confidential Information which may have come to his or her knowledge during the Employment or in respect of which the Employee knows or reasonably should know that Company or any Group Company may be bound by an obligation of confidence to any third party.[4]
>
> ***
>
> All notes, emails and their content (whether sent to or from any Group Company email address and regardless of where such emails are stored), memoranda, and other records (however stored) made by the Employee during Employment and which relate to the business of the Company of any Group Company and which contain Confidential Information will belong to the relevant Group Company and will promptly be handed over

[4] *See* Schedule 1, § 1.2.

> the Company (or as the Company directs) from time to time on request, without copies being kept by the Employee or anyone else on his behalf.[5]

***

44. The standard EA defines Confidential Information to include "information on employees" and "financial and management information including accounts, operating results brokerage and fee income, any other earnings, account profitability, costings, [and] profit margins[.]"[6]

**B. DUAL Negotiated EAs with Kearns and Simnowitz that Resulted in Modifications to Pertinent Provisions of DUAL's Standard EA**

~~42.~~45. Between January 31 and February 4, 2020, Simnowitz engaged in pre-hiring negotiations with Kearns and Beckham about the bonuses that he would be paid at DUAL. As a result of these discussions, Beckham agreed that (i) DUAL would cover the calendar year bonus that Simnowitz had earned at his prior employer; (ii) DUAL would pay Simnowitz a bonus in December 2020 equal to 40% of his fiscal year 2020 salary; (iii) DUAL would pay Simnowitz a bonus in December 2021 equal to 40% of his fiscal year 2021 salary. Beckham also agreed that Simnowitz's employment agreement with DUAL would generally track the terms of Kearns' employment agreement with DUAL, except with respect to title and compensation and other features specific to their respective employments.

~~43.~~46. Simnowitz commenced employment with DUAL on February 17, 2020. DUAL thereafter granted Simnowitz benefits and paid his salary twice per month.

---

[5] *See* Schedule 1, § 1.3.

[6] *See* Schedule 1, § 1.1(b), (g).

~~44.~~47. On or around February 26, 2020, Beckham emailed Simnowitz a copy of DUAL's standard EA but told Simnowitz that it would need to be revised in accordance with the terms Beckham and Simnowitz had discussed.

~~45.~~48. On February 26, 2020, Simnowitz sent a revised version of the EA to DUAL's then general counsel, Katherine Billingham, copying Beckham. Among other changes, Simnowitz removed the language concerning restrictive covenants on the ground that it had been agreed his employment would be at-will and he would not be bound by any restrictive covenants or subject to any garden leave. Negotiations over Simnowitz's EA thereafter paused pending the negotiation of Kearns' EA.

~~46.~~49. On February 28, 2020, DUAL paid Simnowitz a signing bonus of $200,000.

~~47.~~50. Kearns commenced employment with DUAL on March 9, 2020, and DUAL tendered him a standard EA shortly thereafter. The parties negotiated the terms of Kearns' employment agreement until early April. During these negotiations, Kearns pushed back on the standard EA's Non-Compete and restrictive covenants and eventually agreed to modified versions of some of the restrictive covenants.

~~48.~~51. On April 6, 2020, Kearns sent an email to Beckham attaching a proposed final EA and Kearns' signature on its signature page. Kearns' transmittal email indicated that he had added the word "material" to section 11.3(iv) of the EA and that the EA's numbering sequence was off. Kearns also wrote the following:

> Assuming we will fix the number sequence and agree to the change noted above, I am signed-off on the agreement. I have enclosed a scanned version of the signature page, which is contingent on confirmation of agreement correcting the number sequence and the requested change to 11.3(iv). I trust this will result in the release of the funds, which were promised to me on Friday, with your assurance of payment no later than today, without the requirement of final signatures. Please confirm for me when the funds will be wired. Thanks.

~~49.~~52. On April 9, 2020, DUAL paid Kearns a signing bonus of $275,000.

~~50.~~53. In the fall of 2020, DUAL's general counsel, Katherine Billingham, realized that Simnowitz had never signed an EA. Simnowitz advised Billingham of his agreement with Beckham that Simnowitz's EA would generally track the terms of Kearns' EA.

~~51.~~54. Billingham and Simnowitz thereafter exchanged several drafts. In the course of the exchanges, Simnowitz complained several times that the EA tendered to him was either different from Kearns' EA or from the compensation terms Beckham had promised him. The differences between the contents of the proposed drafts and Simnowitz's expectations were due to the fact that Beckham had not clearly explained to DUAL's in-house lawyers what he had promised to Simnowitz.

~~52.~~55. On December 4, 2020, Billingham finally received confirmation from Beckham regarding what he had promised Simnowitz. Billingham sent Simnowitz a proposed final EA with redlines to show how it had been conformed to Kearns' EA. Billingham asked that Simnowitz sign the EA, but DUAL never received back a copy signed by Simnowitz.

~~53.~~56. On or around December 15, 2020, and as expressly required in the negotiated EAs, DUAL paid Simnowitz a bonus of $140,000 and Kearns a bonus of $146,000.

~~54.~~57. As a result of this process, Kearns and Simnowitz both agreed with DUAL to modifications of certain provisions in the standard EAs.

a. Kearns and Simnowitz are not subject to the Non-Compete and No-Dealing Provisions, which were deleted from their contracts.

b. Kearns and Simnowitz remain subject to the Non-Solicit Provision, but the relevant post-termination period was reduced from 12 months to six months.

c. Kearns and Simnowitz each agreed to extend their Notice Provisions from 30 days to 90 days.

d. No changes were made to the No-Recruitment Provision in Kearns' and Simnowitz's EAs. They are still barred from trying to recruit DUAL employees for employment elsewhere for a period of 12 months following their Termination Dates.

e. No changes were made to the Loyalty Provisions in the Kearns and Simnowitz EAs.

58. DUAL, Kearns, and Simnowitz have assented to the EAs by performing in accordance with them and by affirming their rights and duties under them.

~~55.~~59. DUAL subsequently paid Kearns bonuses of $1,154,600 in December 2021 and $1,902,850 in December 2022.

~~56.~~60. DUAL subsequently paid Simnowitz bonuses of $400,000 in December 2021 and $815,000 in December 2022.

**C. Darragh Signed a Standard EA**

~~57.~~61. Darragh commenced employment with DUAL on February 17, 2020. DUAL thereafter granted Darragh benefits and paid Darragh his salary on a twice-monthly basis.

~~58.~~62. On February 28, 2020, DUAL paid Darragh a signing bonus of $140,000.

~~59.~~63. On September 9, 2020, DUAL tendered a standard EA to Darragh but sent it to an incorrect email address. On November 18, 2020, DUAL noticed the error and sent the same EA to Darragh at a correct email address.

~~60.~~64. On November 19, 2020, Darragh signed DUAL's standard EA and remitted his signature with no proposed changes to the agreement.

65. DUAL and Darragh have assented to their EA by performing in accordance with it and by affirming their rights and duties under it.

~~61.~~66. DUAL paid Darragh a bonus of $118,000 on or around December 15, 2020. DUAL subsequently paid Darragh bonuses of $325,000 in December 2021, and $675,000 in December 2022.

### D. The Individual Defendants Also Enrolled in an Employee Stock Purchase Program and Received Shares Worth Substantial Amounts when Vested

~~62.~~67. DUAL, through its ultimate parent company in the United Kingdom, Howden Group Holdings Limited ("HGH"), allows certain key employees to participate in various management incentive plans. These management incentive plans involve the issuance of restricted stock in HGH known as D-Shares. The D-shares come with a target value. If the business unit participating in a specific management incentive plan achieves various financial performance targets, an individual participant's D-shares, when they vest, will convert to A-Shares in HGH. The D-Shares typically are subject to a nominal subscription price in order to comply with tax laws. Given the seniority of the Individual Defendants and their importance to driving the financial success of the TR team, DUAL allowed the Individual Defendants to enroll in multiple management incentive plans and the Individual Defendants were awarded D-shares in those plans. DUAL loaned the Individual Defendants money to purchase their shares.

~~63.~~68. Kearns ultimately obtained 1,330,976 D-shares across four management incentive plans, including D73, D74, D123, and D124. Kearns achieved his five-year performance targets for the D73/D74 plan within only 18 months, which entitled him to $7,317,456 in A-share value upon the vesting of the D-shares and subject to certain restrictions in the HGH Shareholders Agreement and Articles of Association. Kearns' target value for the D123 plan was $9,103,059

and his target value for the D124 plan was $6,041,889. The D124 plan, however, was closed down in 2023 after DUAL's Public Directors & Officers line of business was closed.

~~64.~~69. Simnowitz ultimately obtained 435,726 shares across three management incentive plans, including D73, D74, and D123. Simnowitz achieved his five-year performance targets for the D73/D74 plan within only 18 months, which entitled him to $3,048,936 A-share value upon the vesting of the D-shares and subject to certain restrictions in the HGH Shareholders Agreement and Articles of Association. His target value for the D123 plan was $3,814,608.

~~65.~~70. Darragh ultimately obtained 392,652 shares across four management incentive plans, including D73, D74, D123, and D124. Darragh achieved his five-year performance targets for the D73/D74 plan within only 18 months, which entitled him to $1,524,456 in A-shares upon the vesting of the D-shares and subject to certain restrictions in the HGH Shareholders Agreement and Articles of Association. His target value for the D123 plan was $1,885,632 and his target value for the D124 plan was $3,693,262. The D124 plan, however, was closed down in 2023 after DUAL's Public Directors & Officers line of business was closed.

## III. KEARNS, DARRAGH, AND SIMNOWITZ SECRETLY REACHED AGREEMENT WITH DEFENDANT AVESI PARTNERS TO HELP THEM LAUNCH A NEW TRANSACTIONAL-RISK GA THAT WILL COMPETE WITH DUAL

~~66.~~71. On August 30, 2022, the international consulting firm, McKinsey & Co., published an online article entitled "Insurance GAs: Opportunities and Considerations for Investors." The article noted that PE investment in GAs has recently accelerated for several reasons. First, GAs offer financial characteristics that attract investors: high EBITDA margins, low capital expenditures, and high cash flow. Second, GAs fill a key role in the insurance distribution chain. Third, GAs offer opportunities to create value through data, analytics, and technological improvements.

~~67.~~72. McKinsey also identified two keys risks. First, "investors must pay particular attention to management's underwriting history and expertise in the lines being written" to ensure that high claim rates do not undermine profits. Second, "investors must evaluate the GA's relationship with insurance carriers" because "[t]he single biggest risk for an GA remains the loss, or reduction, of an insurer relationship[.]"

~~68.~~73. Notwithstanding their lucrative compensation by DUAL, the Individual Defendants, while employed by DUAL, secretly commenced negotiations with the PE firm Avesi Partners to launch a new transactional risk GA that will compete with DUAL. ~~Upon information and belief,~~DUAL learned from reputable market sources that Avesi Partners offered Kearns individually $100 million to launch the new GA. The value of this offer gave Kearns a massive financial incentive to give short shrift to his legal obligations to DUAL.

~~69.~~74. Upon information and belief, Avesi Partners approached Kearns first because Kearns was primarily responsible for creating DUAL's TR business unit and primarily responsible for TR's relationships with its insurance carriers.

~~70.~~75. Upon information and belief, Kearns directly or indirectly brought Simnowitz and Darragh into these negotiations, encouraged them to participate in the negotiations, and/or never took steps to allow DUAL to retain Simnowitz and Darragh, all in violation of the Loyalty and No-Recruitment Provisions of Kearns' EA and in breach of his common law duty to loyalty to DUAL. Kearns had a significant conflict of interest given his desire to create a new transactional-risk practice with Avesi Partners and he took no steps to disclose or mitigate that conflict. Instead he hid the conflict to help himself personally and cause the most harm to DUAL so that he could capture DUAL's carrier and producer relationships in order to build a competing business.

~~71.~~76. Upon information and belief, Avesi Partners induced Kearns to recruit Simnowitz and Darragh, or cooperated with Kearns in recruiting Simnowitz and Avesi, because Avesi Partners needed more experienced executives than Kearns to launch the new GA. Avesi knew or had reason to know that Kearns had an EA with DUAL because (1) Kearns told Avesi Partners about his EA, and/or (2) Avesi Partners knew that EAs and restrictive covenants are a common feature of the insurance business generally and of GAs and transactional-risk-insurance GAs in particular.

77. After Kearns was approached by Avesi Partners, he began monitoring closely the claims history on the policies underwritten by DUAL's TR division. Upon information and belief, Kearns disclosed this claims history to Avesi Partners because the claims history was critical in enabling Kearns to negotiate a good deal for himself with Avesi Partners.

~~72.~~78. Upon information and belief, Avesi Partners and the Individual Defendants not only prepared to compete with DUAL, but they actually took concrete steps to compete with DUAL while the Individual Defendants were still employed by DUAL.

~~73.~~79. However, evidence of all of the foregoing misconduct is in Defendants' possession, custody, and control.

## IV. ON SEPTEMBER 8, 2023 – WITHOUT PROVIDING ADVANCE NOTICE TO DUAL – KEARNS, DARRAGH, AND SIMNOWITZ TOLD THE MARKET THAT THEY WERE LEAVING DUAL AND THAT DUAL'S TRANSACTION SOLUTIONS GROUP WAS EFFECTIVELY OUT OF BUSINESS

~~74.~~80. At 5:38 p.m. ET on Friday, September 8, 2023, DUAL's Matthew Flug sent an email to the current DUAL CEO, John Johnson that stated: "My colleagues and I are hearing a vast influx of rumors that several or our TR group's leaders resigned today, though nothing definitive or authoritative. Brokers and law firms have been calling throughout the day seeking guidance, in particular [the broker] Aon who is very concerned about their client base and live

deals. I am unable to get through to Dennis [Kearns] or the EVPs [Simnowitz and Darragh] and thought now it would be most prudent to reach out to you for guidance." Johnson was unaware of any resignations and alarmed by these rumors in the market. Johnson called Kearns, received no answer, and left a voice message for him at 6:25 p.m. ET.

~~75.~~81. Kearns returned Johnson's call at 7:05 p.m. ET and told Johnson he was resigning. Johnson responded that he had already heard this information from Kearns' own team members, who had heard it from the market. Johnson asked Kearns why DUAL was hearing this news from the market and not from Kearns. Kearns said he didn't know. Johnson asked Kearns what he planned to do. Kearns said he would be starting his own GA. Kearns said he had received Simnowitz's and Darragh's resignations earlier that day, but Kearns had not forwarded them to Johnson. Johnson asked Kearns if there would be additional resignations and if he was taking other TR personnel with him, and Kearns said "no." It was clear to Johnson that Kearns was not making any effort at being forthright, communicative, or helpful.

~~76.~~82. During the call Kearns acknowledged the existence of his EA but did not specifically acknowledge his Notice Provision and appeared to believe that his resignation would be effective immediately. Johnson told Kearns that DUAL would be in contact with him with further instructions.

~~77.~~83. The resignations of Simnowitz and Darragh were emailed to Kearns and did not copy anybody else at DUAL. In violation of their Notice Provisions, Simnowitz advised that his last day at DUAL would be September 21; Darragh purported to give two weeks' notice, such that his last day at DUAL would be September 22.

84. Upon information and belief, because Kearns, Simnowitz, and Darragh all initially believed that their Notice Provisions did not exist or were not enforceable, they

proceeded to compete with DUAL and otherwise breach their duties of loyalty to DUAL during their notice periods.

~~78.~~85. Johnson called DUAL's head of information technology and asked him to turn off access to DUAL's systems for Kearns, Simnowitz, and Darragh. In the course of remotely disabling the DUAL-related software on Kearns' cell phone, DUAL inadvertently wiped the cell phone clean of both work-related and personal data. DUAL does not possess a copy of the information on Kearns' cell phone.

## V. ~~DUAL IMMEDIATELY~~AS THE INDIVIDUAL DEFENDANTS CONTINUED TO ACT DISLOYALLY, DUAL SUFFERED SUBSTANTIAL INJURIES THAT CONTINUE TO ACCRUE

### A. ~~DUAL Lost Deal Flow and Substantial Business as~~ Defendants Induced Potential Customers To Believe DUAL Could No Longer Underwrite Policies, and DUAL Lost Deal Flow and Substantial Business

~~79.~~86. On Saturday, September 9, 2023, DUAL lost the first of its pending deals when the broker Aon pulled TR off of Project Noble. When DUAL reached out to Aon the following day, Aon responded that its "leadership collectively decided it was prudent to pause trading during this period of uncertainty."

~~80.~~87. On Monday, September 11, 2023, at least one industry publication reported that Kearns, Simnowitz, and Darragh were leaving DUAL to launch their own GA, to be financially backed by an unnamed private equity firm.

~~81.~~88. On information and belief, Kearns, Simnowitz, Darragh, and/or Avesi Partners were the sources for this report, and they acted for the purpose of gaining media attention for their new venture while simultaneously harming DUAL's reputation and ability to retain its employees and customers.

~~82.~~89. During the week that began on September 11, 2023, DUAL began hearing rumors in the market that its TR division was effectively "out of business" due to the resignations.

~~83.~~90. Upon information and belief, Defendants directly or indirectly published this view for the purpose of destabilizing DUAL's TR group and increasing the chances of recruiting TR's employees to work at the new GA.

91. Over the following three weeks, DUAL lost virtually all of the deals that it would otherwise have closed after September 8, 2023 if the Individual Defendants had fulfilled their legal duties. The credibility of the market rumors that DUAL was "out of business" and the corresponding decline in DUAL's deal flow demonstrate the unique and extraordinary importance of Kearns, Simnowitz, and Darragh to DUAL's TR business. In essence, Kearns, Simnowitz, and Darragh were collectively key employees for maintaining DUAL's relationships with referral sources, customers, and prospective customers.

~~84.~~92. During fiscal years 2022 and 2023, TR had been averaging approximately $1.67 million in profits per month. DUAL therefore had a reasonable expectation of being able to earn approximately $15 million in profits during the nine-month period covered by Kearns' and Simnowitz's Notice Period and Non-Solicit Provisions.

93. Upon information and belief, Defendants disclosed to the market other Confidential Information for the purpose of further destabilizing DUAL's business relationships and reputation.

**B. The Individual Defendants Directly or Indirectly Caused Six More Members of DUAL's Transaction Risk Division To Resign from DUAL and Join the New Venture**

94. The Individual Defendants knew that DUAL's insurance carrier partners relied upon the expertise of the Individual Defendants and a select group of key DUAL personnel in order to authorize DUAL to underwrite transactional risk policies. The Individual Defendants knowingly coordinated their departures and the recruitment of other key DUAL personnel because they knew that it would benefit Defendants' new GA at the expense of DUAL.

95. On September 15, 2023, one week after Kearns, Simnowitz, and Darragh gave notice of their resignations, five more TR members submitted resignation notices: (i) Yash Jafari, the SVP in charge of TR's tax liabilities line, (ii) Flug, a SVP on the reps & warranties team, (iii) Ken Sebastianelli, an assistant vice president on the reps & warranties team, (iv) underwriter Nicole Calderon, and (v) underwriter Megan Greene.

96. At least two of the five TR employees who resigned on September 15 informed the company they were leaving to work with Kearns, Simnowitz, and/or Darragh, or words to that effect. Another two of the resigning employees alluded that they were leaving to join a private-equity-backed GA, but did not disclose to DUAL whether that GA was the same one created by Kearns, Simnowitz, and Darragh. On information and belief, Kearns, Simnowitz, and Darragh (while still employed by DUAL) directly or indirectly solicited one or more of the DUAL employees who resigned on September 15.

97. DUAL quickly responded to these resignations by preparing counter-offers with retention bonuses for TR employees who would stay with DUAL. DUAL succeeded in persuading only one of the departing employees to stay: Jafari.

98. During the week of September 25, two additional Transaction Risk employees, Joseph Cubero and Sarah Oldam resigned, and DUAL was unable to persuade these two employees to stay. The total number of resignations is ten, and the total number of imminent departures is nine (all except Jafari).

99. The timing of the resignations and DUAL's discussions with the departing employees during its unsuccessful campaign to retain them suggest to DUAL that Kearns, Simnowitz, and/or Darragh were and are in active communication with DUAL's other employees and are directly or indirectly urging them to leave DUAL, in violation of the No-

Recruitment Provisions of the Individual Defendants' EAs and in violation of their duties of loyalty while still employed and paid by DUAL.

### ~~B.~~C. Defendants Injured DUAL's Relationships with Its Insurer Partners by Poaching DUAL's Key Employees and by Dissuading the Insurer Partners from Dealing with DUAL and/or by Soliciting Them to Support Defendants' New Venture

100. ~~Also on~~Because DUAL's insurance-carrier partners relied upon the expertise of the Individual Defendants and the other key DUAL personnel whom Defendants recruited, the coordinated and rapid-fire resignations of these employees had the intended effect of undermining DUAL's relationships with its carrier partners.

~~85.~~101. On September 11, 2023, CNA imposed a temporary freeze on all of TR's new transactional risk business based on the resignations of Kearns, Simnowitz, and Darragh.

~~86.~~102. On September 12, 2023, CNA asked DUAL to describe TR's "internal underwriting authority hierarchy" and to provide a list of all open quotes and TR's current pipeline of new opportunities. DUAL responded the same day.

~~87.~~103. Also on September 12, 2023, TR's carrier partner, Old Republic, sent TR notice that it would be terminating the parties' PAA effective October 12, 2023 based on the occurrence of a "Key Man Event," which the contract defined to occur "if Dennis Kearns ceases to be actively involved in the management and underwriting of the Program." Old Republic advised that Kearns' resignation on September 8 was a Key Man Event.

~~88.~~104. On September 21, 2023, TR's carrier partner, Palms, suspended TR's underwriting authority based on Kearns' resignation notice and his lack of further engagement in any of TR's transactional risk matters. Palms also gave its 120-day notice of cancellation of its PAA.

89.105.On October 3, 2023, and while in contact with the Individual Defendants and/or Avesi Partners, CNA gave DUAL 20 days' notice of the termination of the parties' PAA due to the departures of key DUAL personnel. CNA's reasons for terminating with 20 days' notice instead of 180 days' notice are based on an allegation that the Individual Defendants' efforts described herein have (i) deprived DUAL of sufficient competent personnel to operate the TR business and (ii) caused the loss of the Old Republic and Palms underwriting authority that permitted DUAL to offer quota share insurance of transactional-liability risks with limits of up to $50M across the four carriers that supported TR.

106. The reactions of DUAL's carrier partners to the news of the Individual Defendants' resignations reflect the unique and extraordinary importance of the Individual Defendants to DUAL's TR business. In essence, Kearns, Simnowitz, and Darragh were collectively key employees for maintaining DUAL's carrier-partner relationships for transactional risk insurance.

107. Based on DUAL's conversations with these carriers suggests to, DUAL believes that Kearns (and perhaps other Individual Defendants) are in active communicationscommunication with these carriers and dissuading these carriers from continuing to do business with DUAL and/or soliciting these carriers to support Defendants' new venture, all in violation of the Individual Defendants' Non-Solicit Provisions in their EAs and in violation of theirand fiduciary obligations to DUAL given that they engaged in such communications.

90.108.All of the Individual Defendants' disloyal conduct alleged above occurred before or during the Individual Defendants' Notice Periods and, thus, while they remainedthe Individual Defendants were employed by DUAL and receiving paychecks and benefits from DUAL. Avesi

promoted, induced, or aided and abetted all of the foregoing conduct for the purpose of facilitating the launch of its new GA.

### C. Six More Members of DUAL's Transaction Risk Division Resigned To Join the New Venture

91.1. On September 15, 2023, one week after Kearns, Simnowitz, and Darragh gave notice of their resignations, five more TR members submitted resignation notices: (i) Yash Jafari, the SVP in charge of TR's tax liabilities line, (ii) Flug, a SVP on the reps & warranties team, (iii) Ken Sebastianelli, an assistant vice president on the reps & warranties team, (iv) underwriter Nicole Calderon, and (v) underwriter Megan Greene.

92.1. At least two of the five TR employees who resigned on September 15 informed the company they were leaving to work with Kearns, Simnowitz, and/or Darragh, or words to that effect. Another two of the resigning employees alluded that they were leaving to join a private-equity-backed GA, but did not disclose to DUAL whether that GA was the same one created by Kearns, Simnowitz, and Darragh. On information and belief, Kearns, Simnowitz, and Darragh (while still employed by DUAL) directly or indirectly solicited one or more of the DUAL employees who resigned on September 15.

93.1. DUAL quickly responded to these resignations by preparing counter-offers with retention bonuses for TR employees who would stay with DUAL. DUAL succeeded in persuading only one of the departing employees to stay: Jafari.

94. These negotiations, and their generally unsuccessful results, suggest to DUAL that Kearns, Simnowitz, and/or Darragh were and are in active communication with DUAL's employees and urging them to leave DUAL, in violation of the No-Recruitment Provisions of the Individual Defendants' EAs and in violation of their duties of loyalty while still employed and paid by DUAL.

~~95.~~1. ~~During the week of September 25, two additional Transaction Risk employees, Joseph Cubero and Sarah Oldam resigned, and DUAL was unable to persuade these two employees to stay. The total number of resignations is ten, and the total number of imminent departures is nine (all except Jafari).~~

## VI. THE RESTRICTIVE COVENANTS IN DUAL'S EMPLOYMENT AGREEMENTS ARE NECESSARY TO PROTECT DUAL'S LEGITIMATE INTERESTS

~~96.~~109.DUAL required ~~mandatory notice periods~~Notice Provisions for its high-ranking employees in the TR business unit because it knew that if Individual Defendants decided to leave DUAL without a lengthy runway to the termination date, DUAL would not have time to reassure its insurance-carrier partners, producers, customers, prospective customers, and team employees of the continued viability of the TR division and its ability to continue to underwrite business. During Individual Defendants' notice periods, DUAL reasonably expected that each Individual Defendant would affirmatively assist DUAL in the retention of its key relationships and refrain from taking actions that would injure or jeopardize DUAL's business. In other words, DUAL reasonably expected Individual Defendants to, among other things, refrain from notifying the public and media of their impending departures (news that would likely deter DUAL's customers and referral sources from sending new business to DUAL, and which could motivate DUAL's employees to seek new employment), continue to perform at DUAL's request any job duties (including intaking and underwriting business on behalf of DUAL), and assist with job transitions as needed. In turn, each Individual Defendant would continue to be paid salary, and be provided benefits, for the full duration of their notice period.

~~97.~~110.For similar reasons, DUAL included the ~~Notice~~Loyalty, Non-Solicit, and No-Recruiting Provisions in each Individual Defendant's EA. Trusting that the Individual Defendants were committed to the company, DUAL invested heavily in the Transactional Risk

division, including, among other investments, doubling the size of the team by April of 2021, hiring a new Vice President, and furthering the company's strategic growth initiative in October of 2022 with three additional new hires. Because DUAL's customers and its referral sources frequently work with a number of firms and are not exclusively bound to DUAL, relationships are paramount. The restrictive covenants in Individual Defendants' EAs were reasonable in scope and were necessary to prevent Individual Defendants from causing DUAL irreparable harm by, among other things, leaving without notice (causing a disorderly transition), soliciting DUAL's employees, customers, and potential customers, and intentionally or inadvertently creating the impression in the market that DUAL would no longer have the capability to underwrite transactional-risk business going forward.

## VII. ON OCTOBER 11, 2023, THE INDIVIDUAL DEFENDANTS PURPORTED TO TERMINATE THEIR EMPLOYMENTS WITH DUAL

~~98.~~111. All of the conduct described in the foregoing paragraphs occurred while Individual Defendants were still employees of DUAL and receiving salaries and benefits from the company.

~~99.~~112. When Individual Defendants learned that DUAL filed this lawsuit on October 11, 2023, they notified DUAL through counsel that they considered their employments to be terminated and that they would no longer feel constrained from competing with DUAL.

~~100.~~113. Kearns and Simnowitz thus breached their Notice Provisions because they did not serve out the mandatory ~~notice period~~Notice Periods contained in their EAs, which would have ended on December 7, 2023.

**COUNT I - BREACH OF CONTRACT**
**AGAINST EACH INDIVIDUAL DEFENDANT**

101.114. DUAL hereby incorporates by reference, as if fully set forth herein, each allegation contained in all prior paragraphs and makes them a part hereto as though set forth more particularly herein.

102.115. The Individual Defendants' EAs are valid, enforceable, and unambiguous.

103.116. To the extent the EAs were not signed by either or both parties, they are enforceable because the past and present conduct of the parties demonstrates the parties accepted by performance the terms and conditions contained there. For example, DUAL paid the salary, bonuses (including signing and annual bonuses), and provided benefits to Defendants, who in turn accepted the compensation and benefits provided under their employment agreements, performed the job duties assigned to them by DUAL, and held themselves out as DUAL employees.

104.117. The Individual Defendants breached the Notice, Loyalty, and Confidentiality Provisions of their EAs by (i) sharing DUAL Confidential Information with Avesi Partners, including but not limited to information about each Individual Defendant's DUAL compensation and job performance and the DUAL's transactional risk claims history, in order to negotiate a deal to launch a new GA for DUAL; (ii) informing the transactional risk market that they were resigning immediately, without regard to their Notice Provisions and before working with DUAL to mitigate the potential effects of this announcement, (iiiii) publishing the false rumor that DUAL's TR division was effectively out of business without making any attempt to maintain the business, and (iiiiv) declining to share with DUAL the material and detrimental information that Avesi Partners was preparing to compete with DUAL and, was going toalready soliciting or would in the future solicit DUAL's carrier partners for

capacity, and was already soliciting or would in the future solicit employees in DUAL's TR team.

~~105.~~118. The Individual Defendants breached the Loyalty and Non-Solicit Provisions of their EAs by urging TR's insurance carrier partners, who are all Restricted Insurers for purposes of the EAs, to support them in their new GA venture and by undermining the carrier partners' confidence in DUAL.

~~106.~~119. The Individual Defendants breached the Loyalty and No-Recruiting Provisions of their EAs by inducing each other and other DUAL employees to join the new GA and to leave DUAL's employment.

~~107.~~120. Darragh plans imminently to breach the Non-Compete Provisions of his EA because Individual Defendants intend to launch the new GA when their employment ends.

121. DUAL has been harmed by this conduct, including the loss of deals and profits, the loss of business relations opportunities, and the loss of key employees from DUAL's Transactional Risk division.

122. DUAL also faces the imminent risk of future harm in the form of lost business relationships and opportunities and the resignation of other key employees if Defendants' conduct is not abated.

**COUNT II - BREACH OF EMPLOYEE FIDUCIARY DUTIES OF LOYALTY AGAINST EACH INDIVIDUAL DEFENDANT**

~~108.~~123. DUAL hereby incorporates by reference, as if fully set forth herein, each allegation contained in all prior paragraphs and makes them a part hereto as though set forth more particularly herein.

~~109.~~124. Each Individual Defendant owed a common-law fiduciary duty to DUAL, based on a relationship of trust, that each Individual Defendant would, during their entire DUAL employment, act at all times with loyalty and honesty towards the company.

~~110.~~125. The Individual Defendants breached their common-law duties of loyalty to DUAL by (i) sharing DUAL Confidential Information with Avesi Partners, including but not limited to information about each Individual Defendant's DUAL compensation and job performance and the DUAL's transactional risk claims history, in order to negotiate a deal to launch a new GA for DUAL; (ii) informing the transactional- risk market that they were resigning immediately, without regard to their Notice Provisions and before working with DUAL to mitigate the potential effects of this announcement, (~~ii) directly or indirectly~~iii) publishing the false rumor that DUAL's TR division was effectively out of business without making any attempt to maintain the business, and (~~iii~~iv) declining to share with DUAL the material and detrimental information that Avesi Partners was preparing to compete with DUAL ~~and was going to~~, was already soliciting or would in the future solicit DUAL's carrier partners for capacity, and was already soliciting or would in the future solicit employees in DUAL's TR team.

~~111.~~126. The Individual Defendants breached their common-law duties of loyalty to DUAL by urging TR's insurance-carrier partners to support them in their new GA venture and by undermining the carrier partners' confidence in DUAL.

~~112.~~127. The Individual Defendants breached their common-law duties of loyalty to DUAL by inducing each other and other DUAL employees to join the new GA and to leave DUAL's employment and not otherwise informing DUAL when they knew their direct reports

and team members were being recruited by a competitor in a manner that would immediately harm DUAL.

~~113.~~128. DUAL ~~was~~has been harmed by this conduct, including the loss of deals and profits, the loss of business relations opportunities, and the ~~resignation~~loss of key employees ~~in~~from DUAL's Transactional Risk division.

129. DUAL also faces the imminent risk of future harm in the form of lost business relationships and opportunities and the resignation of other key employees if Defendants' conduct is not abated.

**COUNT III – AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY**

~~114.~~130. DUAL hereby incorporates by reference, as if fully set forth herein, each allegation contained in all prior paragraphs and makes them a part hereto as though set forth more particularly herein.

~~115.~~131. Each Individual Defendant owed a fiduciary duty to DUAL, based on a relationship of trust, that each Individual Defendant would, during their entire DUAL employment, act at all times with loyalty and honesty towards the company.

~~116.~~132. Each Individual Defendant was aware that the other Individual Defendants owed these duties to DUAL during the entire period of their DUAL employments.

~~117.~~133. By its practice and dealings as a sophisticated private-equity firm, and through employment negotiations and other communications with the Individual Defendants, Avesi Partners was aware or should have been aware that each Individual Defendant owed these duties to DUAL during the time they remained DUAL employees.

~~118.~~134. Each Defendant aided and abetted each Individual Defendant in breaching his fiduciary duties to DUAL during the time he was still a DUAL employee.

~~119.~~135. DUAL ~~was~~has been harmed by this conduct, including the loss of deals and profits, the loss of business relations opportunities, and the ~~resignation~~loss of key employees ~~in~~from DUAL's Transactional Risk division.

136. DUAL also faces the imminent risk of future harm in the form of lost business relationships and opportunities and the resignation of other key employees if Defendants' conduct is not abated.

**COUNT IV – TORTIOUS INTERFERENCE WITH CONTRACT**

~~120.~~137. DUAL hereby incorporates by reference, as if fully set forth herein, each allegation contained in all prior paragraphs and makes them a part hereto as though set forth more particularly herein.

~~121.~~138. Each Individual Defendant knew about the EA of every other Individual Defendant because they discussed them with each other, were familiar with the industry, and were familiar with DUAL's hiring practices.

~~122.~~139. Avesi knew about the Individual Defendants' EAs and their relevant provisions because the Individual Defendants told Avesi about the EAs, showed Avesi copies of their EAs, and/or because Avesi knows or had reason to know that such EAs are common in the insurance industry generally, and among transactional-risk GAs in particular.

~~123.~~140. Avesi induced the Individual Defendants to breach the Loyalty Provisions of their EAs by inducing or encouraging them (i) to inform the transactional-risk market that they were resigning before working with DUAL to mitigate the potential effects of this announcement, (ii) to publish the false rumor that DUAL's TR division was effectively out of business without making any attempt to maintain the business, and (iii) not to share with DUAL the material and detrimental information that Avesi was preparing to compete with DUAL and was going to solicit employees in DUAL's TR team.

~~124.~~141. Avesi Partners also induced the Individual Defendants to breach the Non-Solicit Provisions of their EAs by inducing or encouraging TR's insurance carrier partners, who are all Restricted Insurers for purposes of the EAs, to support them in their new GA venture and to undermine the carrier partners' confidence in DUAL.

~~125.~~142. Avesi Partners induced the Individual Defendants to breach the No-Recruiting Provisions of their EAs by inducing or encouraging them to solicit other DUAL employees to join the new GA and to leave DUAL's employment.

~~126.~~143. Each Individual Defendant also induced or encouraged other Individual Defendants in the aforementioned misconduct and, further, to breach the No-Recruiting Provisions of their EAs and to solicit each other, and other DUAL employees, to leave DUAL for the new GA opportunity.

~~127.~~144. Avesi Partners' and the Individual Defendants' actions lacked any justification.

~~128.~~145. ~~Defendants' conduct caused past and ongoing harm to~~ DUAL ~~due to~~has been harmed by this conduct, including the loss of ~~its~~ deals and profits, the loss of business relations opportunities, and the ~~resignation~~loss of key employees ~~in its Transaction~~from DUAL's Transactional Risk division.

146. DUAL also faces the imminent risk of future harm in the form of lost business relationships and opportunities and the resignation of other key employees if Defendants' conduct is not abated.

**COUNT V - TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**

~~129.~~147. DUAL hereby incorporates by reference, as if fully set forth herein, each allegation contained in all prior paragraphs and makes them a part hereto as though set forth more particularly herein.

~~130.~~148. Individual Defendants were aware of DUAL's prospective economic relations, including the business deals that were in the works as of September 8, 2023, and DUAL's potential customers.

~~131.~~149. Defendant Avesi Partners was aware of DUAL's prospective economic relations, including some or all of the business deals that were in the works as of September 9, 2023, and DUAL's potential customers, through discussions and negotiations with the Individual Defendants.

~~132.~~150. Defendants intentionally interfered with DUAL's economic prospects by taking actions likely to create the false perception that DUAL could not, or would not, underwrite transactional-risk business after Individual Defendants left DUAL.

~~133.~~151. Defendants' conduct was undertaken for the purpose of harming DUAL.

~~134.~~152. Defendants' interference with DUAL's prospective economic relations was wrongful and improper.

~~135.~~153. DUAL ~~was~~has been harmed by ~~such interference by Defendants~~this conduct, including the loss of deals and profits, the loss of business relations opportunities, and the ~~resignation~~loss of key employees ~~in~~from DUAL's Transactional Risk division.

154. DUAL also faces the imminent risk of future harm in the form of lost business relationships and opportunities and the resignation of other key employees if Defendants' conduct is not abated.

**COUNT VI – FAITHLESS SERVANT DOCTRINE**
**AGAINST EACH INDIVIDUAL DEFENDANT**

~~136.~~155. DUAL hereby incorporates by reference, as if fully set forth herein, each allegation contained in all prior paragraphs and makes them a part hereto as though set forth more particularly herein.

~~137.~~156. Each Individual Defendant owed a duty to act as a faithful servant of DUAL, based on a relationship of trust, that each Individual Defendant would, during their entire DUAL employment, act at all times faithfully towards the company.

~~138.~~157. The Individual Defendants breached their duties to DUAL by (i) informing the transactional-risk market that they were resigning before working with DUAL to mitigate the potential effects of this announcement, (ii) directly or indirectly publishing the false rumor that DUAL's TR division was effectively out of business without making any attempt to maintain the business, and (iii) declining to share with DUAL the material and detrimental information that Avesi Partners was preparing to compete with DUAL and was going to solicit employees in DUAL's TR team.

~~139.~~158. The Individual Defendants breached their duties to DUAL by urging TR's insurance-carrier partners to support them in their new GA venture and by undermining the carrier partners' confidence in DUAL.

~~140.~~159. The Individual Defendants breached their duties to DUAL by inducing each other and other DUAL employees to join the new GA and to leave DUAL's employment and not otherwise informing DUAL when they knew their direct reports and team members were being recruited by a competitor in a manner that would immediately harm DUAL.

~~141.~~160. Each Individual Defendant was enriched at DUAL's expense by accepting and not returning the compensation and benefits (including signing bonuses and annual bonuses)

paid by DUAL to them under those contracts, and the loans extended to them for purchases of D-shares under the HGH performance incentive program, during the period of their disloyalty.

161. DUAL has been harmed by this conduct, including the loss of deals and profits, the loss of business relations opportunities, and the loss of key employees from DUAL's Transactional Risk division.

162. DUAL also faces the imminent risk of future harm in the form of lost business relationships and opportunities and the resignation of other key employees if Defendants' conduct is not abated.

~~142.~~163. Because the above-described conduct by Individual Defendants was, among other things, intentional or deliberate and in willful and wanton disregard to the rights of DUAL, DUAL is entitled to an award of punitive damages.

**COUNT VII - UNJUST ENRICHMENT**
**AGAINST EACH INDIVIDUAL DEFENDANT**

~~143.~~164. DUAL hereby incorporates by reference, as if fully set forth herein, each allegation contained in all prior paragraphs and makes them a part hereto as though set forth more particularly herein.

~~144.~~165. Alternatively, if the Court does not find enforceable contracts between DUAL and the Individual Defendants, the Individual Defendants are liable under the theory of unjust enrichment.

~~145.~~166. Each Individual Defendant was enriched at DUAL's expense by accepting and not returning the compensation and benefits (including signing bonuses and annual bonuses) paid by DUAL to them under those contracts and the loans extended to them for purchases of D-shares under the HGH performance incentive program.

~~146.~~167. It would be against equity and good conscience to allow the Individual Defendants to retain the pay and the value of benefits provided by DUAL, under the pretense of an employment relationship, if the Individual Defendants did not agree to the employment agreement under which such pay and benefits were paid.

**REQUEST FOR JURY TRIAL**

~~147.~~168. DUAL hereby requests a jury trial on all issues so triable.

**PRAYER FOR RELIEF**

**WHEREFORE**, DUAL respectfully requests that judgment be entered in DUAL's favor and against Defendants, and that the Court and/or a jury of the parties' peers award the following relief:

1. Temporarily and permanently enjoin Individual Defendants from violating the Confidentiality Provisions, Notice Provisions, Loyalty Provisions, Non-Compete Provisions, Non-Solicit Provisions, No-Dealing Provisions, and No-Recruiting Provisions of their EAs.
2. Temporarily and permanently enjoin the Individual Defendants from violating their fiduciary duties of loyalty to DUAL while they remain employed during their Notice Periods.
3. Temporarily and permanently enjoin Avesi Partners from allowing, inducing, or encouraging the Individual Defendants to violate the Confidentiality Provisions, Notice Provisions, Loyalty Provisions, Non-Compete Provisions, Non-Solicit Provisions, No-Dealing Provisions, and No-Recruiting Provisions of their EAs.
4. Temporarily and permanently enjoin Defendants' new GA from hiring or employing any DUAL employee who was improperly solicited in violation of a No-Recruitment Provision

in an EA.

5. Award DUAL compensatory damages based on the injuries it has suffered as a result of Defendants' misconduct in an amount to be determined at trial but presently estimated to be at least $15 million.

6. Award punitive damages incurred as a result of Defendants' conduct in an amount to be determined at trial.

7. Order Defendants to disgorge any profits they have earned by their misconduct.

8. Award DUAL its reasonable attorneys' fees and costs as provided for by law or by contract.

9. Award such other relief as the Court may determine to be just and equitable.

Dated: October 19November 28, 2023

DORSEY & WHITNEY LLP

By /s/ *Mark Sullivan*

Mark Sullivan
sullivan.mark@dorsey.com
51 West 52nd Street
New York, New York 10019
Telephone: (212) 415-9200

*F. Matthew Ralph* (

F. Matthew Ralph (admitted *pro hac vice* forthcoming)
ralph.matthew@dorsey.com

Andrew T. James (admitted *pro hac vice* forthcoming)
james.andrew@dorsey.com
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600

Mark Sullivan
sullivan.mark@dorsey.com
51 West 52nd Street
New York, New York 10019
Telephone: (212) 415-9200

*Attorneys for Plaintiff*

**Formatted Table**

**Formatted:** Indent: Left: 0"

**Formatted:** Font: 12 pt, Italic, Underline

**Formatted:** Indent: Left: 0.3"

**Formatted:** Font: Not Italic

**Formatted:** Normal, Don't hyphenate

**Formatted:** Indent: Left: 0"